## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

STUART P. ADLER,
        Plaintiff,

v.                                   Civil Action No. 3:16-cv-00239-JAG

VA. COMMONWEALTH UNIV.,
MICHAEL RAO,
JEROME STRAUSS, III,
and ELIZABETH RIPLEY,
        Defendants.

### OPINION

On May 11, 2015, Virginia Commonwealth University ("VCU") told Dr. Stuart P. Adler that it would not renew his contract for another year. VCU says that it took this action because Adler had not complied with its policies. Adler counters that this reason is pretext, and that VCU really fired him because of his age. Adler also claims that, after his termination, VCU took various additional actions that violated his rights to due process. Finally, Adler claims that two VCU officials defamed him. Because of these alleged wrongs, Adler has sued VCU and three VCU officials.

Establishing the true parties in interest in this case is a somewhat convoluted process. Adler has raised age discrimination claims against two individuals, Dr. Michael Rao and Dr. Jerome Strauss, III, in their official capacities as VCU officials. He has also filed official capacity claims against Strauss and Dr. Elizabeth Ripley for constitutional violations. VCU's status in the case is unclear. On the one hand, Adler has listed VCU in the caption and "parties" section of his second amended complaint, but he has not included any claims against VCU as an entity. On the other hand, a suit against an official in his or her official capacity is a suit against

the entity for which they work. *Hafer v. Melo*, 502 U.S. 21, 25 (1991). Either way, the ultimate disposition of this case precludes relief against VCU.

Adler has sued Strauss and Ripley in their individual capacities for defamation.

The defendants have moved for summary judgment. The record shows that VCU fired Adler for legitimate, non-discriminatory reason, not in violation of the Age Discrimination in Employment Act (the "ADEA").

Adler's constitutional claims have several failings. First, they are barred by the Eleventh Amendment. Second, Adler has received all the process due under the Constitution. Third, VCU did not publish any false statements in conjunction with Adler's termination and therefore did not violate Adler's liberty interests.

His defamation claims fail against the individual defendants. Adler has not produced admissible evidence that Strauss published the alleged defamatory statement. Although Ripley did publish an internal statement about Adler, qualified privilege protects her.

The Court, therefore, grants the defendants' motions for summary judgment on all claims.

## I. BACKGROUND[1]

Born in 1946, Adler began working at VCU in the late 1970s and attained tenure in 1983. Adler specialized in pediatric infectious disease.

---

[1] "VCU Ex. __" refers to exhibits attached to the motion for summary judgment filed by VCU, Rao, and Strauss. "Adler Ex. __" refers to exhibits attached to Adler's opposition to that motion. "Ripley Ex. __" refers to exhibits attached to the motion for summary judgment filed by Ripley. Finally, "Adler-Ripley Ex. __" refers to exhibits attached to Adler's opposition to Ripley's motion.

## A. The Settlement Agreement

In 2011, the Chair of the Department of Pediatrics, Dr. Bruce Rubin, reduced Adler's salary, citing poor job performance. (VCU Ex. 3.) Adler filed a grievance, and the VCU Grievance Board recommended against the salary reduction. (VCU Ex. 3.) On January 25, 2012, Rao, President of VCU, accepted the recommendation and restored Adler's salary. (VCU Ex. 4.)

Throughout the remainder of 2012, Adler viewed a host of actions by VCU as retaliation for winning his grievance. His objections led to a series of internecine squabbles, including grievances and a threatened charge of discrimination. (*See* Adler Exs. 38, 39, 40.)

In late 2012, the parties entered into mediation and, at least for the moment, resolved their contretemps. On December 17, 2012, the parties executed a Settlement and Release Agreement (the "Settlement Agreement"). (VCU Ex. 5.) Under the Settlement Agreement, Adler agreed to retire from his tenured faculty position as of March 31, 2013. VCU would then offer Adler a position as an adjunct research professor in the Department of Microbiology, beginning May 1, 2013, and continuing through June 30, 2014. "Subject to Adler performing satisfactorily and receiving acceptable annual evaluations of his performance, his employment contract [would] be renewed in each of the succeeding four years, beginning July 1, 2014, for a 12 month term." (VCU Ex. 5, at ¶ 4(A).) If Adler accepted the position, he agreed to comply "with all University policies for faculty and complete all required reporting, including, but not limited to, University policies on Outside Professional Activity and Conflict of Interest." (*Id.* at ¶ 5.) The parties agreed to release each other from all claims, with Adler specifically agreeing to release any claim he had at that time arising under the ADEA.

Adler retired from his tenured position as agreed, and then began as an adjunct research professor. After the initial fourteen-month term, VCU renewed his contract for the period of July 1, 2014, through June 30, 2015.

## B. The IND/IDE Policy

On June 25, 2014, VCU announced a new policy, the "IND/IDE Policy." "IND" stands for investigational new drug, and "IDE" stands for investigational device exemption.[2] VCU adopted the policy to ensure compliance with regulations of the Food and Drug Administration (the "FDA") related to clinical studies involving human subjects. (VCU Ex. 1.)

The FDA must authorize studies of drugs or medical devices on humans. The FDA's rules require a "sponsor" to apply for permission to conduct the tests. If the FDA authorizes a study, an "investigator" conducts the clinical investigation, or leads the team that conducts the investigation. The sponsor then has the responsibilities of monitoring the investigation, maintaining certain records, and reporting. *See* 21 C.F.R. §§ 312.50–312.60. The FDA allows one person, a "sponsor-investigator," to assume the roles and responsibilities of both the sponsor and the investigator. The FDA communicates with the sponsor or sponsor-investigator about the IND or IDE, and will not communicate with a research institution, such as VCU, unless the sponsor or sponsor-investigator gives permission.

VCU adopted the IND/IDE Policy to oversee and track all VCU faculty-held INDs or IDEs. VCU designated Ripley as Clinical Research Compliance Officer (the "CRCO") to administer the policy. The IND/IDE Policy requires VCU faculty to report all INDs and IDEs, to submit all correspondence with the FDA, and to submit new IND/IDE applications to the

---

[2] The term "exemption" is involved because, if the FDA authorizes an IND or IDE, it effectively exempts that drug or device from other federal provisions for purposes of the investigation and allows the drug or device to move in interstate commerce.

CRCO before filing them with the FDA. (VCU Ex. 1, at 11.) If a sponsor (or sponsor-investigator) leaves VCU, the sponsor must either transfer sponsorship to another VCU faculty member or obtain permission to take the IND or IDE with him. (*Id.* at 16.)

Adler's inability—or unwillingness—to comply with the IND/IDE Policy set off a new series of spats with VCU.

On September 15, 2014, Ripley sent an email to nine people, including Adler, as a reminder that their IND/IDE reports were due that day. (VCU Ex. 9.) A week after the due date, on September 22, 2014, Ripley spoke with Adler about the new policy and the reporting requirement. (VCU Ex. 10.) She also sent him a follow-up email with not only a reminder to fill out his report but also, to make the task easier, a reporting link. (*Id.*) Adler submitted some, but not all, of the information on October 1, 2014, (VCU Ex. 33), so Ripley emailed him to clarify that he must submit all the required information. (VCU Ex. 11.)

On October 20, 2014, Adler responded, challenging the IND/IDE Policy generally. (*Id.*) Adler also said that he could not disclose the requested information because he had confidentiality agreements with his commercial partners on the INDs. (*Id.*) On October 21, 2014, Susan Robb, the Senior Associate Vice President for Research Administration and Compliance, responded to Adler, further explaining the reasons for the policy and asking him to submit the requested information by October 28, 2014. (VCU Ex. 13.) Robb warned that if Adler balked, VCU would place a hold on his studies. (*Id.*)

Robb also asked Adler to disclose any confidentiality agreements, because VCU needed to execute them, not the individual faculty member. (*Id.*) Robb copied three people on the email "to ensure that all are aware of [Adler's] concerns and [Robb's] response": Strauss, III, Dean of the School of Medicine; Dr. Francis Macrina, Vice President of Research; and Ripley. (*Id.*)

Adler responded later that day, changing his story about the confidentiality agreements. (VCU Ex. 12.) He said he did not have any active confidentiality agreements, but had an "explicit understanding with each partner to maintain confidentiality." (*Id.*) Adler also complained about the policy. Finally, he told Robb he could not meet the October 28, 2014, deadline. (*Id.*) Robb followed up later that evening, providing a list of the documents Adler needed to submit. (VCU Ex. 13.) By letter to Robb dated October 24, 2014, Adler voiced his concerns with the IND/IDE Policy, and asked for a meeting with Robb, Macrina, and a VCU attorney. (Adler Ex. 47.)

A few weeks later, in an effort to get around the IND/IDE Policy, Adler founded the CMV Research Foundation. (Adler Ex. 12, at 18:8-19.) According to Adler, he set up the CMV Research Foundation to have an option available in case he could not find another third party to take over sponsorship of his INDs. (Adler Ex. 13, at 86:3-9.) He did not tell VCU about the foundation.

On December 1, 2014, without clearing it with VCU, Adler submitted a new IND application to the FDA as a sponsor-investigator. (VCU Ex. 14.) The FDA received the application and assigned it an IND number: IND 125064.

On December 2, 2014, Adler met with Ripley, Robb, and Macrina to discuss his INDs. (*See* VCU Ex. 17; VCU Ex. 33, at 3.) The parties agreed that Adler could transfer his INDs to third parties, but that VCU would need documentation. (VCU Ex. 33, at 3.) By letter to Macrina dated December 15, 2014, Adler outlined his plan for his INDs. (VCU Ex. 17.) First, he planned to transfer the sponsorship on two of his INDs: IND 1181 to CMV Research Foundation, and IND 16166 to Trellis Inc. (*Id.*) Transferring the sponsorship of the INDs would move them outside the purview of the IND/IDE Policy. Next, for IND 13411, Adler asked to remain the

sponsor-investigator, but asked for an exemption from compliance with the IND/IDE Policy. (*Id.*) Adler did not mention his new IND, IND 125064.

Ripley responded by letter dated December 19, 2014. (VCU Ex. 18.) For the transfers, she asked for specific documentation. (*Id.*) She also reminded Adler that he needed to update his Financial Interest Report if he had a role (such as board member) in either of the transferee entities, and that he needed to report any outside professional activities if he acted in any capacity beyond investigator. (*Id.*) For IND 13411, Ripley said that Adler did not need to send current documents, but warned Adler that she would audit all faculty-held INDs, including Adler's, in the first six months of 2015. (*Id.*) She asked for all the requested information by January 23, 2015. (*Id.*) Adler did not provide all the information.

In March 2015, Adler submitted to VCU a request to begin a new study. (*See* VCU Ex. 20.) On March 24, 2015, Tricia Zeh, Executive Director for Research Administration, emailed Adler to tell him that VCU needed Adler to correct certain deficiencies before VCU would approve the new study. (VCU Ex. 20.) Among other items, Zeh noted that Adler would need to comply with the IND/IDE Policy because he would serve as the sponsor-investigator, and would need to work with Ripley in regards to the IND. (*Id.*) On March 31, 2015, Zeh reiterated that VCU could not approve the new study until Adler complied with the IND/IDE Policy for his existing INDs. (VCU Ex. 21.) This email noted a May 2015 deadline for providing the required information on his existing INDs. (*Id.*) Another email on April 2, 2015, reiterated the need to comply with the IND/IDE Policy before VCU could approve the new study. (VCU Ex. 22.)

Adler emailed Ripley on April 3, 2015, about his existing INDs. (VCU Ex. 23.) Ripley responded later that day saying that she was "glad to work with" Adler to bring the INDs into compliance. (VCU Ex. 24.) She again noted what needed to happen for each IND. (*Id.*)

7

At some point after this communication, Ripley focused on the Adler-formed CMV Research Foundation, to which Adler planned to transfer some of his INDs. (VCU Ex. 28.) On April 28, 2015, she emailed him a list of items that needed clarification, including his role with the foundation. She also reminded him to update his Financial Interest Report within thirty days of acquiring a new interest. (VCU Ex. 29.) Adler responded later that day and sent more information later that week. (VCU Ex. 30; VCU Ex. 31.)

## C. The Non-Renewal

On May 1, 2015, Robb sent a memorandum to Macrina and Strauss documenting the efforts she and Ripley had made to bring Adler into compliance with the IND/IDE Policy. (VCU Ex. 33.) Robb recommended that VCU (1) terminate all activities associated with INDs for which Adler served as sponsor-investigator, (2) not permit Adler to serve as sponsor-investigator on any other INDs conducted at VCU, (3) not permit Adler to serve as authorized representative on any INDs for other companies without an explicit agreement releasing VCU from liability, and (4) not permit Adler to serve as investigator at VCU for any INDs held by the CMV Research Foundation. (*Id.*) Robb also noted that VCU would conduct an audit on the study conducted under IND 13411 because the study was active. On May 5, 2015, Robb sent a list of policies and regulations that Adler potentially violated to Dr. PonJola Coney, who worked in the Dean's Office. (VCU Ex. 34.)

On May 11, 2015, Strauss notified Adler that VCU would not renew his adjunct faculty appointment for another year and that his employment would end after the current term on June 30, 2015. (Adler Ex. 8.) VCU cited "serious and unacceptable lapses in [Adler's] performance of research compliance responsibilities, other violations of university policy, and failure to comply with the [Settlement Agreement]" as its reasons for considering Adler's performance

unsatisfactory. (*Id.*) VCU cited, among other specific issues, Adler's failure to comply with the IND/IDE Policy and failure to report his connection with the CMV Research Foundation, as required by VCU policy and mandated in the Settlement Agreement. (*Id.*) In May 2015, Strauss confirmed to Dr. Michael McVoy, a friend of Adler, that VCU's decision not to renew Adler's appointment was final. (Adler Ex. 3.)

### D. Other Events in 2015

Three additional series of events unfolded in 2015: (1) VCU withdrew a grant application that Adler had submitted to the National Institute of Health (the "NIH"); (2) VCU audited, and the Institutional Review Board (the "IRB") reviewed, one of Adler's studies; and (3) Adler filed a grievance against Strauss.

#### 1. The NIH Grant

At some point, Adler had applied for a grant from the NIH. On May 14, 2015, Adler emailed Robb about the pending NIH grant and asked that VCU not take any action that could adversely affect the award. (Adler Ex. 43.) In response, Robb told Adler that she "would hold on the NIH proposal as long as possible." (*Id.*) Nevertheless, Coney instructed Robb to withdraw the proposal. (Adler Ex. 22, at 10:35–11:9.) On May 22, 2015, Robb sent a letter to the NIH requesting to withdraw the grant proposal because Adler would not be an employee of VCU after June 30, 2015. (Adler Ex. 44.) At the time Robb sent the withdrawal letter, VCU did not know that NIH had already awarded the grant to VCU. (Adler Ex. 22, at 10:13-18.)

#### 2. The Audit and IRB Proceeding

VCU policy requires the principal investigator (the "PI") for human research studies to be an employee of VCU or a non-employee with a VCU faculty appointment. (VCU Ex. 44.) Accordingly, when Michelle Stickler, Executive Director of the Office of Research Subjects

Protection, learned that VCU had terminated Adler's research privileges, her office administratively suspended the study conducted under IND 13411,[3] pending the appointment of a new PI. (VCU Ex. 43, at 92:25–93:4; VCU Ex. 45.) On May 22, 2015, the Chair of the Department of Microbiology responded, saying that McVoy would assume the responsibilities of the PI for IND 13411. (VCU Ex. 45.) At that point, from Stickler's perspective, McVoy was the PI, not Adler. (VCU Ex. 43, at 70:3-11.)

As discussed earlier with Adler, in June 2015 Ripley began an audit of IND 13411. (VCU Ex. 40; *see* VCU Ex. 8.) During the audit, Ripley reviewed the source documents for only a few of the study participants. (Adler Ex. 18, at 58:7-23; *see* VCU Ex. 41.) On June 9, 2015, Ripley issued her audit report. (VCU Ex. 41.) She sent this information to Strauss, and copied Adler, among others. Adler submitted a response by letter dated June 17, 2015, rejecting each of Ripley's audit findings. (Adler-Ripley Ex. 4.)

In mid- to late-June, Ripley conducted a second audit to review, among other documents, the source documents for all study participants. (*See* VCU Ex. 42.) Ripley issued the second audit report on July 2, 2015. (VCU Ex. 42.) McVoy asked Ripley if he could share the report with Adler. (Adler-Ripley Ex. 12.) Ripley told Strauss that she did not have a problem with Adler seeing the second audit report, but decided to wait on responding to McVoy's question to give others the opportunity to read the report first. (*Id.*)

Ripley sent both audit reports, as well as Adler's objections to the first audit report, to Stickler who, according to Ripley, would decide what the IRB should do. (Adler-Ripley Ex. 12; Ripley Ex. 1, at ¶ 17.) At VCU, the IRB's primary responsibility is "to protect human subjects while adhering to federal and state regulations and university policies and procedures." (Adler

---

[3] IND 13411 is also known as HM10938, and some documents refer to it by the latter number.

Ex. 1.) The IRB makes determinations about studies involving human subjects, including findings regarding study conduct, such as determinations of noncompliance. (*Id.*)

An IRB panel met on August 27, 2015. (Adler Ex. 20.) The agenda included discussion of IND 13411. (*Id.*) The minutes from the meeting reflect that Adler was not the PI after his affiliation with VCU ended. (*Id.* at 2.)[4] The IRB reviewed eight key audit findings, and determined that it would need additional information. (*Id.* at 2–3.) The IRB also found that McVoy was qualified to conduct the study as the new PI. (*Id.* at 3–4.)

In a letter on September 23, 2015, Stickler detailed the IRB findings of noncompliance. (Adler-Ripley Ex. 7.) She explained that the study had no PI after Adler's affiliation with VCU ended, and that the IRB had approved McVoy as the new PI.[5] (*Id.*) Stickler sent the letter to Dana Walters, the contact at the FDA for unanticipated problems and noncompliance. (*Id.*; Adler-Ripley Ex. 8, at 80:23–81:1.)

On October 28, 2015, Adler wrote a letter to the IRB disputing its findings of noncompliance. (Adler-Ripley Ex. 6.) Adler wanted to appeal the IRB findings, but Stickler responded that he could no longer appeal because he was not the investigator. (VCU Ex. 43, at 69:2-11.)

### 3. *The Grievance*

On May 14, 2015, Adler filed a grievance against Strauss for wrongful termination. (VCU Ex. 37.) Specifically, Adler initiated a Type I grievance under the Faculty Mediation and

---

[4] The minutes read: "As of June 1, 2015, Dr. Adler's affiliation with VCU ended. At that time, the study had no active PI . . . ." (Adler Ex. 20, at 2.) The date is presumably a typographical error, as Adler's affiliation with VCU ended on June 30, 2015. Regardless, the minutes make clear that at the time of the IRB meeting, Adler was not the PI on IND 13411.

[5] Like the minutes from the IRB meeting, the letter listed Adler as the PI with the other identifying information about the study (i.e., the number and name). (Adler-Ripley Ex. 7; Adler Ex. 20.) Stickler explained that these documents list Adler as PI because her practice is to identify the PI at the time the issue occurred. (Adler Ex. 49, at 72:14-19.)

Grievance Procedure (the "FMG Procedure"). (*Id.*) The FMG Procedure outlines grievable and non-grievable matters, and specifically lists that actions or decisions "resulting from or subject to other established appeal policies or processes are not grievable." (VCU Ex. 38.) This includes grievances related to discrimination, to which the FMG Procedure refers the reader to the "Internal Discrimination/Harassment Complaint Procedure." (*Id.*)

On June 22, 2015, after attempts to mediate proved unsuccessful, Adler filed his formal grievance against Strauss. (*Id.*) The grievance alleged that Strauss retaliated against Adler for filing a successful grievance in 2012 and for expressing concerns about the IND/IDE Policy. (*Id.*) Adler claims that the retaliation came in the form of his wrongful termination and the loss of his funding from the NIH. (*Id.*)

On August 14, 2015, Adler filed a Charge of Discrimination with the Equal Employment Opportunity Commission (the "EEOC"), alleging age discrimination and retaliation. (Adler Ex. 45.) On August 20, 2015, Marilyn Miller, the Chair of the Faculty Mediation and Grievance Panel, contacted Adler to ask if his pending grievance included claims of discrimination. (VCU Ex. 39, at ¶ 6.) When Adler confirmed that it did, Miller told Adler that the FMG Procedure did not cover grievances for claims of discrimination. (*Id.*) Miller asked Adler how he would like to proceed, but never heard back. (*Id.* at ¶¶ 7–9.)

Adler then filed an amended Charge of Discrimination with the EEOC, dated September 4, 2015, which added information about VCU denying his grievance. (Am. Compl. Ex. 5.) Adler later filed a second amended Charge of Discrimination with the EEOC in which he added information about the audits and IRB proceedings. (Adler Ex. 41.)

## II. <u>DISCUSSION</u>[6]

Adler has sued Rao, Strauss, and Ripley. Against Rao and Strauss in their official capacities,[7] Adler alleges violations of the ADEA—disparate treatment and retaliation. Against Strauss and Ripley in their official capacities, Adler alleges § 1983 claims based on due process violations. Finally, Adler alleges defamation against Strauss and Ripley in their individual capacities.

### A. ADEA Claims

Adler alleges that VCU fired him either because of his age, or because Adler had complained of age discrimination in 2012. Adler further alleges that VCU took other adverse actions to retaliate against him for opposing age discrimination. Specifically, Adler alleges (1) that VCU pulled his NIH funding because Adler had filed a grievance with VCU; (2) that Adler lost his right to proceed with his grievance because he filed his August 2015 Charge with the EEOC; and (3) that Adler was prevented from participating in the IRB proceedings because he filed his September 2015 Amended Charge with the EEOC.

The ADEA prohibits employers from discriminating against employees because of their age, and from retaliating against employees who oppose age discrimination. 29 U.S.C. § 623. To succeed on either type of claim, the plaintiff must demonstrate that the employer took adverse

---

[6] The defendants move for summary judgment on all counts of the second amended complaint. Rule 56 of the Federal Rules of Civil Procedure directs courts to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In deciding a summary judgment motion, the court must draw all reasonable inferences in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Nevertheless, if the non-moving party fails to sufficiently establish the existence of an essential element to its claim on which it bears the ultimate burden of proof, the court should enter summary judgment against that party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

[7] As noted above, the official capacity claims are effectively against VCU, the entity employing the official capacity defendants.

action against the plaintiff *because of* his age or *because of* his opposition to age discrimination. *Id.*; *Dockins v. Benchmark Commc'ns*, 176 F.3d 745, 747 (4th Cir. 1999) (citing *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983)). An employer who takes adverse action for legitimate, non-discriminatory reasons, such as performance issues, does not violate the ADEA, regardless of the employee's age. *Id.* at 750. When evaluating employee performance, the employer's perception matters, not the self-assessment of the employee. *King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003).[8]

In this case, the record clearly shows that Adler did not comply with the IND/IDE Policy and that this failure caused him to lose his job. VCU showed extraordinary patience in its efforts to persuade and help him to comply with the rules. Adler, however, did not like the IND/IDE Policy, carped about it for months, and ultimately did not follow it. He refused to submit the information requested by the CRCO for months after the due date. He submitted an application for a new IND to the FDA, without first giving it to the CRCO.[9] In response, Adler says that he "made every single effort possible to be compliant." (Adler Ex. 13, at 86:13-14.) But when evaluating performance, VCU's assessment counts, not Adler's self-assessment. *See King*, 328 F.3d at 149. VCU found that Adler violated the policy, and, based on the undisputed record, the Court agrees. Adler had every right to disagree with the IND/IDE Policy, but VCU had every right to fire him for noncompliance.

---

[8] *See also DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) (cautioning that courts do not "sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination" (citation omitted)).

[9] Adler disputes whether the record shows that Adler acted without discussing the matter with the CRCO. The record includes a document from the FDA assigning IND 125064 for an application submitted December 1, 2014, which named Adler as sponsor. (VCU Ex. 14.) By letter dated December 15, 2014, Adler outlined a plan for his sponsor-investigator INDs, and did not mention IND 125064. (VCU Ex. 17.)

Adler argues that the reasons VCU gave for the non-renewal are pretext, disputing two of the four reasons that VCU listed in the May 11, 2015 letter from Strauss. The first reason listed by VCU was failure to create and adhere to monitoring plans for existing INDs. Specifically, the letter read: "You have not met the requirements for monitoring and reporting sponsor-investigator held INDs as required *by VCU* and the FDA." (Adler Ex. 8 (emphasis added).) Adler asserts this reason is pretext because the FDA does not require monitoring plans, and that only active studies needed monitoring plans. But this argument ignores the fact that the IND/IDE Policy did require certain monitoring and reporting with which he failed to comply. The second reason listed by VCU in the May 11, 2015 letter was Adler's failure to disclose his affiliation with CMV Research Foundation, which Adler should have reported in accordance with the Outside Professional Activity Policy. Adler disputes that this policy applied to him, as the text of the policy focuses on full-time faculty, exempting part-time faculty members from its specific procedures. (Adler Ex. 11.) Adler, however, provides no argument as to why the term of the Settlement Agreement that explicitly required compliance with that specific policy does not control. (VCU Ex. 5, at ¶ 5)

Adler offers no evidence that VCU's valid, non-discriminatory reasons for not renewing his contract were pretext. Because Adler cannot establish that VCU fired him because of his age or because of his opposition to age discrimination, the Court grants summary judgment to the defendants on the ADEA claims related to Adler's termination as the adverse action.

As to the other instances of alleged ADEA retaliation, VCU had legitimate, non-discriminatory reasons for the alleged "adverse actions."[10]

---

[10] The Court assumes without deciding that the actions meet the definition for "adverse actions" under the ADEA. The Court is dubious, however, that some of the alleged adverse actions would meet the definition. In the retaliation context, the adverse action must be material, such

Regarding the NIH grant, VCU withdrew the pending application because it had ended its relationship with Adler.[11]

As to the IRB proceedings, VCU did not allow Adler to participate because he no longer worked for VCU and, more importantly, was no longer the PI on the study.[12] Adler argues that this reason is pretext because "Defendants continued treating Adler as the PI for many months after his termination." (Mem. Opp'n VCU's Mot. Summ. J. 29.) The record directly contradicts this argument. Although some documents name Adler as the PI in the description of the study, the texts of those very documents explain that the study had no PI after Adler's job with VCU ended.

Finally, in regards to the discontinuance of Adler's grievance, VCU discontinued the grievance because the type of grievance Adler filed was not grievable under the FMG Procedure. Instead, VCU had a separate procedure to deal with grievances related to discrimination. So while VCU did discontinue Adler's grievance only after he filed the August 2015 Charge, it did so because the Charge clarified that Adler's grievance included claims of discrimination. With a

that the action would dissuade a reasonable employee from making or supporting a charge of discrimination. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). *Cf. Adams v. Anne Arundel Cnty. Pub. Sch.*, 789 F.3d 422, 431 (4th Cir. 2015) (applying White's definition of adverse action to an ADA retaliation claim). Especially for the claim regarding VCU discontinuing its grievance, the possibility that an employer would deny a grievance that disputed an employee's termination would likely not dissuade the reasonable employee from making a charge of age discrimination, as the ultimate adverse action—being fired—has already happened.

[11] Adler argues that this action was retaliatory because "VCU agreed to hold on until June 30, 2015," to make a decision about the pending NIH application. (Mem. Opp'n VCU's Mot. Summ. J. 20, at ¶ 43.) The record, however, makes clear that Robb only promised to "hold on the NIH proposal *as long as possible*," (Adler Ex. 43 (emphasis added)), and Coney later told Robb to contact the NIH.

[12] This retaliation claim also fails because the timeline does not match the factual record. Adler asserts the VCU retaliated against him by preventing him from participating in the IRB proceedings because he filed an amended charge of discrimination in September 2015. The record shows, however, that the IRB made its decisions on August 27, 2015, before Adler filed this charge.

claim of discrimination included, Adler's claim was non-grievable under the FMG Procedure. Accordingly, Adler has not sufficiently established an essential element of these retaliation charges—that VCU took these "adverse actions" because of Adler's opposition to age discrimination.

To summarize, Adler has not pointed to any evidence from which a rational juror could find that VCU took the actions that it did because of Adler's age or because of Adler's opposition to age discrimination in violation of the ADEA. VCU had legitimate, non-discriminatory reasons for firing Adler, for withdrawing the pending NIH grant, for not permitting him to participate in the IRB proceedings, and for discontinuing his grievance. Consequently, the Court grants summary judgment to the defendants on the ADEA claims.

### B. Due Process Claims

Adler brings his due process claims against VCU officials in their official capacities under the doctrine of *Ex Parte Young*, 209 U.S. 123 (1908). *Ex Parte Young* provides a limited exception to the Eleventh Amendment bar on suits against States. *Lytle v. Griffith*, 240 F.3d 404, 408–09 (4th Cir. 2001). Specifically, *Ex Parte Young* permits suits against state officers acting in their official capacity, and applies when the plaintiff "alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002). In other words, the *Ex Parte Young* exception focuses on ensuring that the future conduct of state officials complies with federal law. *Quern v. Jordan*, 440 U.S. 332, 337 (1979). It does not apply where the alleged violation occurred entirely in the past. *DeBauche v. Trani*, 191 F.3d 499, 505 (4th Cir. 1999). Additionally, mere conjecture that a similar violation may happen in the future cannot "transform a one-time event into a continuing governmental practice or an ongoing violation." *Id.*

Applying these principles to the facts of this case, Adler fails to allege any ongoing violation of federal law; his claims, therefore, do not fall within the *Ex Parte Young* exception. Adler bases his due process claims on the facts that VCU discontinued his grievance and did not let him participate in the IRB proceedings. Any argument that these past violations amount to ongoing violations are mere conjecture that a similar violation may happen at some point, to some VCU employee, in the future.[13] This is not enough to benefit from the *Ex Parte Young* exception. Thus, the Eleventh Amendment bars Adler's due process claims. Thus, the Court grants summary judgment to the defendants on these claims.

Even if the Eleventh Amendment does not bar them, Adler's due process claims also fail on the merits. To succeed on his due process claim based on VCU discontinuing his grievance in Count III, Adler must show (1) the existence of a protected interest, (2) the deprivation of that interest by a state actor, and (3) the occurrence of that deprivation without due process of law. *See Tri-County Paving, Inc. v. Ashe Cnty.*, 281 F.3d 430, 436 (4th Cir. 2002). Courts measure such claims against the federal standard of what process is due, not state-created procedures. *See Riccio v. Cnty. of Fairfax*, 907 F.2d 1459, 1469 (4th Cir. 1990). Assuming that Adler holds a property interest in continued employment with VCU based on the Settlement Agreement, the record shows that Adler received the process due him under the Constitution. VCU gave Adler notice of the reasons for his termination. Adler then filed a grievance, and VCU and Adler mediated the grievance for over a month. Additionally, Adler had the opportunity to file a grievance based on discrimination. In other words, Adler received notice of the reasons for his termination and an opportunity to respond, both pre- and post-termination.

---

[13] Even these arguments miss the mark, however, because the record shows that VCU has a procedure to handle grievances based on discrimination, and has a procedure to govern IRB proceedings. The fact that Adler may not have benefitted from these procedures amounts to a one-time event that occurred entirely in the past.

In Count IV, Adler's seems to assert a liberty interest claim based on VCU excluding him from the audit and IRB proceedings. To prevail, Adler must show that VCU made a statement that (1) placed a stigma on his reputation, (2) was made public by the employer, (3) was made in conjunction with his termination or demotion, and (4) was false. *Sciolino v. City of Newport News*, 480 F.3d 642, 646 (4th Cir. 2007). To the extent Adler bases this claim on the audit reports, Ripley only sent these reports internally, so these reports were not made public by VCU. To the extent Adler bases this claim on the findings of the IRB that VCU published to the FDA, VCU made these statements in conjunction with the proceedings before the IRB, not in conjunction with Adler's termination. Indeed, VCU terminated Adler in May 2015, and sent the letter detailing the findings of the IRB in September 2015. The connection between the two events is tenuous at best. Further, the record does not support the falsity of the statement.

To the extent that Adler says he had a procedural due process right to participate in the audit and IRB review in Count IV, he cites no case that a former employee has a due process right to take part in his former employer's review of it practices.

In sum, the due process claims in Counts III and IV simply fail.

### C. Defamation Claims

Finally, Adler alleges that both Strauss and Ripley defamed him by stating that Adler "had acted negligently and recklessly during his research and had thus 'endangered the lives of human research subjects' or words to that effect." (2d Am. Compl. ¶ 192.) As to Strauss, Adler relies on his own testimony that McVoy told Adler that Strauss said words to this effect. As to Ripley, Adler points to her two audit reports.

To state a claim for defamation in Virginia, the plaintiff must allege that the defendant published an actionable statement about the plaintiff with the requisite intent. *Schaecher v.*

*Bouffault*, 290 Va. 83, 91, 99, 772 S.E.2d 589, 594, 598 (2015). A qualified privilege may attach to certain communications, providing the defendant with a defense to a claim of defamation. *Cashion v. Smith*, 286 Va. 327, 337, 749 S.E.2d 526, 532 (2013). To overcome a qualified privilege, the plaintiff must prove by clear and convincing evidence that the defendant lost or abused the privilege by acting with malice. *Id.* at 338–39, 749 S.E.2d at 532–33.

The Court grants Strauss summary judgment on this claim because Adler has offered no admissible evidence that Strauss published the alleged defamatory statement. The only evidence Adler offers as to his defamation claim against Strauss is Adler's claims that "Dr. McVoy told Dr. Adler that he was terminated because Jerome Strauss said that Dr. Adler was placing subjects and VCU at risk with his clinical trials." (Adler Ex. 42, at 2.) This is inadmissible hearsay— Adler attempts to use McVoy's statement to prove what Strauss said.[14] *See* Fed. R. Evid. 801– 804. At summary judgment, a party can support its motion by showing that an adverse party cannot produce admissible evidence to support a fact. Fed. R. Civ. P. 56(c)(1)(B). Adler has produced no admissible evidence to establish that Strauss published the alleged defamatory statement. Because Adler cannot establish an essential element of his defamation claim, the Court enters summary judgment for Strauss.

As to Ripley, the Court finds that her audit reports are privileged. Qualified privilege attaches to communications "between persons on a subject in which the persons have an interest or duty." *Cashion*, 286 Va. at 337, 749 S.E.2d at 532 (citation and quotation marks omitted). In this case, Ripley published her reports only to employees at VCU who had an interest in the

---

[14] Further, McVoy denied that Strauss gave McVoy any details about why VCU decided not to renew Adler's contract.

study or in the results of the audit.[15]   Accordingly, the Court finds that qualified privilege

attaches to Ripley's audit reports.

To overcome the qualified privilege, Adler must point to evidence that Ripley acted with

malice.  In Virginia, a plaintiff can prove common law malice by showing that:

> (1) the statements were made with knowledge that they were false
> or with reckless disregard for their truth;
> (2) the statements were communicated to third parties who have no
> duty or interest in the subject matter;
> (3) the statements were motivated by personal spite or ill will;
> (4) the statements included strong or violent language
> disproportionate to the occasion; or
> (5) the statements were not made in good faith.

*Cashion*, 286 Va. at 339, 749 S.E.2d at 533 (internal citations, quotations marks, and alteration

omitted).  Any one of these options suffices to prove malice.  *Id.*  A plaintiff, however, cannot

satisfy his burden with only unsupported and conclusory statements.  *Jafari v. Old Dominion*

*Transit Mgmt. Co.*, 913 F. Supp. 2d 217, 224 (E.D. Va. 2012).

After a thorough review of the record, the Court finds that Adler has failed to produce

evidence from which a rational juror could find that Ripley published her audit reports with

malice.  As the CRCO, Ripley conducted audits of all faculty-held INDs, not just Adler's.

Ripley communicated her reports only to those with an interest in the matter.  Adler produced no

evidence that Ripley acted with personal spite, ill will, bad faith, or recklessness.  Indeed, the

record shows that Ripley attempted to work with Adler to bring his INDs into compliance with

the IND/IDE Policy for the better part of six months.

In his opposition, Adler points to all of his qualms with VCU—the withdrawn NIH grant,

the grievance denial, the IRB proceedings.  But to succeed on a claim of defamation, the focus is

---

[15]   Adler does not seem to argue that a qualified privilege would not attach to this
communication.  (*See* Mem. Opp'n Ripley's Mot. Summ. J. 24–26.)

on the intent of the specific defendant, not the intent of the defendant's employer or co-workers. As to Ripley specifically, Adler points to her not treating Adler as the PI of the audited study, despite the fact that "VCU continued treating Adler as PI of IND 13411 for many more months after his termination." (Mem. Opp'n Ripley's Mot. Summ. J. 25.) As previously noted, the record directly contradicts this argument. *See infra* Part II.A. Adler also highlights that Ripley knew the statements made in the audit report were false because "Adler told her they were false," (*id.* at 26), citing to Adler's written response after publication of the first audit report. Even assuming Adler told Ripley that some of the statements in the first audit report were false *after* publication, and assuming the statements were actually false,[16] this has no relevance to Ripley's state of mind at the time of publication. Because Adler has failed to produce evidence from which a rational juror could find that Ripley published her audit reports with malice, an essential element of his defamation claim against Ripley, the Court grants summary judgment to Ripley.

### III. CONCLUSION

For the reasons stated, the Court grants the defendants' motions for summary judgment in full.

The Court will enter an appropriate order.

Let the Clerk send a copy of this Opinion to all counsel of record.

Date: _____ May 1 ____, 2017
Richmond, VA

/s/
John A. Gibney, Jr.
United States District Judge

---

[16] Indeed, for many of the statements that Adler claims are false, he really just disagreed with Ripley's conclusion that Adler had not documented events correctly. For example, in her first audit report, Ripley stated, "There is no training log or documentation that study personnel were trained on the protocol." (Ripley Ex. 2.) Adler admits that there was no training log, but stated that he had completed the training and that the FDA only recommends, but does not require, training logs. (Adler-Ripley Ex. 4.) In other words, Ripley's statement was not false; Adler simply disputed the necessity of the documentation.